IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-01488-PAB

LAKEWOOD CITIZENS WATCHDOG GROUP, a Colorado nonprofit corporation,

      Plaintiff,

v.

CITY OF LAKEWOOD, COLORADO, a Colorado Home Rule Municipal Corporation, and
BRUCE ROOME, in his official capacity as City Clerk, City of Lakewood, Colorado,

      Defendants.

_____

**ORDER ON THE MERITS PURSUANT TO FED. R. CIV. P. 65(a)(2)**
_____

This matter is before the Court pursuant to Fed. R. Civ. P. 65(a)(2).  Plaintiff filed a Motion for Temporary Restraining Order and for Preliminary Injunction [Docket No. 2]. With the parties consent, the Court consolidated the preliminary injunction hearing with a trial on the merits.  Accordingly, this order constitutes a final adjudication of the issues before the Court in this case.

**I. BACKGROUND**

**A.  Factual Background**[1]

Plaintiff Lakewood Citizens Watchdog Group ("Watchdog") is an organization that publishes *The Whole Story* ("TWS"), a newsletter that reports on local issues in Lakewood, Colorado.  Docket No. 1 at 1-2.  Defendant City of Lakewood, Colorado

_____

[1] These facts come from plaintiff's complaint and motion for temporary restraining order and preliminary injunction.  Defendants do not dispute plaintiff's factual statements.  *See* Docket No. 13 at 2; Docket No. 17 at 2 ("[T]he facts are not at issue.").

("Lakewood" or the "city") is a Colorado Home Rule Municipal Corporation.  *Id.* at 3.
Defendant Bruce Roome is the City Clerk (the "Clerk") for Lakewood, who is
responsible for the administration and enforcement of Lakewood campaign finance
laws.  *Id.*  Watchdog started as an online website in 2014.  *Id.* at 4.  Since 2015,
Watchdog has published two to three issues of TWS per year.  *Id.*  It is distributed to
Lakewood residents; the distribution totals approximately 22,000 copies.  *Id.*
Watchdog's mission, as stated on the front page, is to "keep the people informed of the
happenings of their local government that are ignored by a compliant news media."  *Id.*

Plaintiff has provided the Court with copies of the October 2019 and
Spring/Summer 2021 TWS editions.  *See* Docket No. 2-6 at 11-18; Docket No. 2-11.
The October 2019 edition is eight pages long, with about three articles per page.  *See*
Docket No. 2-6 at 11-18.  The articles discuss topics ranging from overviews of the
2019 Lakewood mayoral and city council races to Lakewood's alleged failure to recover
a loan made to developers.  *Id.* at 14-16.  The descriptions of the elections include
candidate comparisons, noting the candidates' voting records and which candidates
were fund-raising from "special interest donors."  *See id.* at 13-15.  The Spring/Summer
2021 TWS edition is also eight pages and includes a preview of the upcoming fall 2021
city council race.  *See* Docket No. 2-11 at 2.  The edition contains, *inter alia*, articles on
development and growth in Lakewood, the possible expansion of Bear Creek Lake, and
the harassment of non-cooperative city council members by the mayor.  *See id.* at 1-2,
6, 8.

Plaintiff brings this case because it fears that defendants will enforce Lakewood

municipal election disclosure and disclaimer regulations against it.  On January 14, 2019, the Lakewood City Council passed Ordinance O-2018-22 (the "ordinance"), replacing Lakewood Municipal Code § 2.54.  Docket No. 2 at 1.  The ordinance imposes disclosure and disclaimer requirements on certain election-related communications.  At issue in this case are the ordinance's rules regarding independent expenditures and electioneering communications.

An "expenditure" is "any purchase, payment, distribution, loan, advance, deposit, or gift of money by any person for the purpose of expressly advocating the election or defeat of a candidate or supporting or opposing a ballot issue or ballot  question. . . ." Lakewood, Colo., Municipal Code § 2.54.020.  An "independent expenditure" is "an expenditure that is not controlled by or coordinated with any candidate or agent of such candidate. . . ."  *Id*.  An "electioneering communication"

> means any communication broadcast by television or radio, printed in a newspaper or on a billboard, directly mailed, transmitted by means of the internet, or delivered by hand to personal residences or otherwise distributed that: (I) unambiguously refers to any candidate without expressly advocating that candidate; and (II) is broadcast, printed, mailed, delivered or distributed within 60 days before a municipal election; and (III) is broadcast to, printed in a newspaper distributed to, mailed to, delivered by hand or electronically transmitted to any communication by persons made in the regular course and scope of their business or any to an audience that includes members of the electorate for such public office.

*Id*.  If a person makes independent expenditures or electioneering communications, the ordinance requires that person to include certain disclosures and disclaimers with his or her communication.  *See id.* §§ 2.54.030(F), 2.54.070.

Plaintiff asks the Court to find that (1) the independent expenditure and

electioneering communication[2] portions of the ordinance violate the First Amendment freedom of the press, both facially and as applied to Watchdog; (2) the ordinance's regulation of political speech violates the First Amendment right of free speech; and (3) the definitions and regulations of expenditures and electioneering communications in the ordinance are void for vagueness.  Docket No. 1 at 13-20.  Plaintiff seeks an order (1) permanently enjoining defendants from enforcing the independent expenditure and electioneering communication regulations or, in the alternative, enjoining enforcement against Watchdog's publication of TWS or any similar publication; (2) for declaratory relief that the expenditure and electioneering communication regulations are void and unenforceable because they violate the First Amendment rights of free speech and the press and the Fourteenth Amendment's guarantee of due process against vague laws; and (3) nominal damages of $17.91 and cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988.  *Id.* at 20-21.

**B.  Procedural Background**

On June 2, 2021, plaintiff filed its complaint and a motion seeking a temporary restraining order ("TRO") and preliminary injunction ("PI").  *See* Docket Nos. 1, 2.  The Court ordered briefing on the portion of the motion seeking a TRO.  *See* Docket No. 7.

---

[2] The complaint states that Lakewood Municipal Code §§ 2.54.020, 2.54.030, and 2.54.070 violate the First Amendment.  *See* Docket No. 1 at 16.  Section 2.54.020 is the definition provision; plaintiff only challenges the definitions of expenditure and electioneering communication.  Accordingly, the Court does not consider the other definitions in section 2.54.020 to be at issue in this case despite plaintiff's contention that all of section 2.54.020 violates the First Amendment.  Section 2.54.030 contains a multitude of provisions, of which only those concerning independent expenditures, § 2.54.030(F), have been challenged.  Therefore, the Court does not consider the portions of section 2.54.030 besides section 2.54.030(F) to be at issue.

On June 16, 2021, the Court held a hearing on the portion of the motion seeking a TRO.  *See* Docket No. 14.  The focus of the TRO was plaintiff's desire to publish the Spring/Summer 2021 issue of TWS, but the fact it had not done so out of concern that defendants would enforce the independent expenditure regulations against it.  *See* Docket No. 2 at 11-12, 15.  At the TRO hearing, defendant Roome, through counsel, indicated that he would not enforce the independent expenditure regulations against the Spring/Summer 2021 TWS issue.  Based on this representation, the Court denied the portion of the motion seeking a TRO as moot and set a PI hearing.[3]  *See id*.  The parties briefed the portion of the motion seeking a PI, *see* Docket Nos. 17, 18, and on July 22, 2021 the Court held a hearing on the motion for a PI.  Docket No. 19.  At the hearing, the parties made argument but did not present any witnesses or exhibits.  The parties agreed that there were no disputed factual issues and that it would be proper for the Court to consolidate the PI hearing with a trial on the merits under Fed. R. Civ. P. 65(a)(2).

## II.  ANALYSIS

### A.  Standard of Review

Plaintiff argues that the ordinance is a content-based restriction of speech and,

---

[3] At the PI hearing, defendants explained that the Clerk considers there to be two steps involved in determining whether an independent expenditure that requires disclosure of a donor has occurred: (1) the communication must be express advocacy, and (2) the purpose of a donor must have been to create that express advocacy. Defendants stated that, because the Spring/Summer 2021 TWS issue contained articles on myriad issues, the Clerk would have been unable to conclude that any donation was made for the purpose of express advocacy.  At the PI hearing, plaintiff indicated that it had published the Spring/Summer 2021 TWS issue two weeks prior to the hearing.

as a result, the Court should review it applying strict scrutiny.  Docket No. 2 at 3.  In the alternative, plaintiff argues that, even if the Court applies the lower standard of exacting scrutiny, the ordinance is still unconstitutional.  *Id.*

"Disclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities, and do not prevent anyone from speaking." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366 (2010) (internal citations and quotations omitted).  Because of this, "[t]he Court has subjected these requirements to 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."  *Id.* at 366-67 (quoting *Buckley v. Valeo*, 424 U.S. 1, 64, 66 (1976)); *see also Citizens United v. Gessler*, 773 F.3d 200, 209 (10th Cir. 2014) (collecting cases applying exacting scrutiny to disclosure requirements)**.**

The Supreme Court recently reviewed the issue of exacting scrutiny in *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021) (hereinafter "*APF*").  The case considered the constitutionality of a California law that compelled the disclosure of a charity's major donors.  141 S. Ct. at 2380.  California obtained this information by requiring charities to submit a tax form listing the names and addresses of donors contributing over $5,000 annually to the charity.  *Id*.  The charities in question refused to submit such information.  *Id*.  The Court held that the disclosure requirement was facially unconstitutional.  *Id.* at 2389.

As for the standard of review, a majority of the Court did not reach agreement. The Chief Justice, joined by Justices Kavanaugh and Barrett, stated that exacting

6

scrutiny applies to First Amendment challenges to compelled disclosure.  *Id.* at 2383.

The Chief Justice noted that the exacting scrutiny standard was "first enunciated" in a

campaign finance case, *Buckley*, 424 U.S. at 64-68, and stated that "exacting scrutiny

is not unique to electoral disclosure regimes."  *APF*, 141 S. Ct. at 2383.

Justice Thomas concurred in part and concurred in judgment.  *Id.* at 2389.

Justice Thomas agreed that the disclosure requirements at issue failed under exacting

scrutiny, but he would have applied strict scrutiny because the California law required

compelled disclosure of protected First Amendment associations.  *Id.* at 2390.  Justice

Alito, joined by Justice Gorsuch, concurred in part and concurred in judgment, stating

that "I am not prepared at this time to hold that a single standard applies to all

disclosure requirements.  And I do not read our cases to have broadly resolved the

question in favor of exacting scrutiny."  *Id.* at 2391.  Justice Alito noted that, because

the choice between strict and exacting scrutiny had no effect on the decision, he saw

no need to decide which standard to apply or whether the same level of scrutiny should

be applied in all First Amendment compelled disclosure of association cases.  *Id.* at

2392.

*APF* thus gives some support to plaintiff's argument that strict scrutiny should

apply in this case.  However, because *Citizens United* applied exacting scrutiny to

disclosure and disclaimer requirements in the election context, and *APF* does not

specifically overrule *Citizens United*'s holding regarding the standard of review, the

Court finds that it is appropriate to apply exacting scrutiny.

*APF* provides guidance on what "exacting scrutiny" requires.  Not only must a

7

disclosure requirement be substantially related to a sufficiently important government interest, but the disclosure requirement must also be narrowly tailored to the government's interest.  *APF*, 141 S. Ct. at 2383.  "While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest."  *Id.*  "[A] substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored."  *Id.* at 2384.  With this standard in mind, the Court turns to the Lakewood ordinance.[4]

## B.  Independent Expenditures

The Court first considers whether the independent expenditure provisions apply to issues of TWS and, if so, whether this violates the First Amendment.  Plaintiff argues that the independent expenditure regulations do not pass exacting scrutiny because they are not narrowly tailored and substantially related to a sufficiently important

_____

[4] The Tenth Circuit has "recognized that disclaimer statutes, which require that a speaker include specified language or information in her speech, impose more substantial burdens on First Amendment rights than disclosure or reporting provisions[.]"  *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1199 (10th Cir. 2000) (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 355 (1995)).  In *Davidson*, the court noted that the difference between disclosure and disclaimer requirements is constitutionally significant and that the "Supreme Court confirmed its distaste for such statutes last year in *ACLF*, when it affirmed this court's invalidation of a Colorado law requiring petition circulators to wear identification badges that included the circulator's full name."  *Id.*  However, *Citizens United* did not draw any distinction between disclaimer and disclosure requirements and evaluated both under exacting scrutiny.  *See* 558 U.S. at 366-71.  The Tenth Circuit recognized as much when it added the following descriptive parenthetical to *Citizens United*, with the alterations appearing in *Gessler,* 773 F.3d at 209: ("The Court has subjected [disclaimer and disclosure] requirements to exacting scrutiny" (internal quotation marks omitted)).  Accordingly, the Court will apply exacting scrutiny to both the disclosure and disclaimer requirements of the ordinance.

governmental interest.  *See* Docket No. 2 at 11-12; Docket No. 18 at 8-10.  Specifically, plaintiff argues that issues of TWS are not express advocacy or its functional equivalent and, therefore, requiring plaintiff to disclose donor information or place disclaimers on TWS issues would fail exacting scrutiny.  *See* Docket No. 2 at 11-12; Docket No. 18 at 8-10.  Additionally, plaintiff argues that these disclosures and disclaimers unconstitutionally restrain the freedom of association.  *See* Docket No. 2 at 1.

### 1.  *Regulatory Framework*

The Lakewood Municipal Code requires disclaimers and disclosures for certain kinds of communications.  Section 2.54.030(F)(3)(a) contains the following disclaimer provision:

> [i]n addition to any other applicable requirements provided by law, and subject to the provisions of this section, any communication that is broadcast, printed, mailed, delivered, or otherwise circulated that constitutes an independent expenditure for which the person making the independent expenditure expends of $500.00 or more on the communication shall include in the communication a statement that: (I) A statement that the communication has been "paid for by (full name of the person paying for the communication)" (II) A statement that the communication is "Not authorized by any candidate"; and (III) The name of a natural person who is the registered agent if the person identified in subparagraph (I) of this paragraph (a) is not a natural person.

Municipal Code § 2.54.030(F)(3)(a).  An expenditure is "any purchase, payment, distribution, loan, advance, deposit, or gift of money by any person for the purpose of *expressly advocating* the election or defeat of a candidate or supporting or opposing a ballot issue or ballot  question. . . ."  *Id.* § 2.54.020 (emphasis added).  An "independent expenditure" is "an expenditure that is not controlled by or coordinated with any candidate or agent of such candidate. . . ."  *Id*.

An independent expenditure committee "means one or more persons that make an independent expenditure in an aggregate amount [of] $500.00 or more, or that collect $500.00 or more from one or more persons for the purpose of making an independent expenditure." *Id.* § 2.54.020.  As an independent expenditure committee,[5] in addition to the disclaimer provision discussed above, plaintiff must (1) register with the City Clerk within two business day of the date on which it accepts in donations or spends as expenditures $500, *id.* § 2.54.030(F)(1)(a); and (2) disclose plaintiff's full name, a natural person authorized to act as its registered agent, an address and phone number of its principal place of operations, and the aggregate ownership interest in it held by foreign nationals or corporations, *id.* § 2.54.030(F)(1)(b).  Section 2.54.030(F)(2) requires the disclosure of similar information to section 2.54.030(F)(1)(a), in addition to (1) the name and street address of the registered agent; (2) the name and address of any person that, for the purpose of making an independent expenditure, donates more than $250 to the independent expenditure committee, *id.* § 2.54.030(F)(2)(b)(I), if (a) the donor is a natural person, the person's occupation and employer, or (b) the person is not a natural person, the person's name, parent corporation, names the person does business under, address of the person's "home office," and name and street address of the registered agent, *id.* § 2.54.030(F)(2)(b)(II)-(III); and (3) the name of the candidate who the independent expenditure is intended to support or oppose, *id.* § 2.54.030(F)(4).  Section

---

[5] The record does not provide any information on the amounts that plaintiff receives as donations or expends on each issue of TWS.  However, defendants do not challenge that plaintiff qualifies under this and various other monetary thresholds, and the Court accordingly will consider them met.

2.54.030(F)(5) also requires plaintiff to establish a separate account at a financial institution and deposit all donations funding independent expenditures in such account.

Section 2.54.050(B) sets forth the enforcement procedures.  That section allows "[a]ny person who believes that a violation of this chapter has occurred" to file a written complaint within 120 days of the filing of the allegedly deficient report.  *Id.* § 2.54.050(B).  The City Clerk is required to dismiss a frivolous or groundless complaint and refer non-frivolous non-groundless complaints to an "independent hearing officer." *Id.* § 2.54.050(B)(1.2).  The hearing officer's decision "shall be final, subject to review by the district court."  *Id.*  The City Clerk may also initiate a complaint based on information the City Clerk "is aware [of] and finds credible and reliable."  *Id.* § 2.54.050(B)(1.3).

### 2.  *Governmental Interest*

In order to pass exacting scrutiny, disclosure and disclaimer requirements must be substantially related and narrowly tailored to a sufficiently important government interest.  *See APF*, 141 S. Ct. at 2383.  "The *Buckley* Court identified important government interests that could meet the [exacting scrutiny] burden, including 'provid[ing] the electorate with information,' 'deter[ring] actual corruption and avoid[ing] the appearance of corruption,' and 'gathering the data necessary to detect violations of' other election laws."  *Indep. Inst. v. Williams*, 812 F.3d 787, 792 (10th Cir. 2016) (quoting *Buckley*, 424 U.S. at 66-68).  The informational interest is a legitimate government interest that can support disclosure requirements.  *Gessler*, 773 F.3d at 210.  "[D]isclosures related to independent expenditures can 'help citizens make informed choices in the political marketplace.'"  *Id.* (quoting *Citizens United*, 558 U.S. at

11

368). However, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). Defendants argue that Lakewood has an informational interest in requiring the disclosure of donors.[6] Docket No. 17 at 6.

### 3. Substantial Relationship and Narrow Tailoring

The ordinance must have a substantial relationship and be narrowly tailored to the informational interest in order to survive exacting scrutiny. *See APF*, 141 S. Ct. at 2383. Defendants argue that the ordinance is substantially related to the informational interest because it allows the public to discover who is funding the viewpoints expressed by TWS. *See* Docket No. 17 at 6-7. Plaintiff argues that independent expenditure regulations can only constitutionally be applied to express advocacy or its functional equivalent, *see* Municipal Code § 2.54.020 ("*Expenditure* means any purchase . . . for the purpose of expressly advocating the election or defeat of a candidate . . . ."), and the content of TWS cannot be considered express advocacy or its functional equivalent. *See* Docket No. 2 at 11-12.

Plaintiff was fined under the ordinance for its October 2019 issue of TWS. *See* Docket No. 2-7. The Lakewood Administrative Hearing Office ("AHO") found that the October 2019 issue of TWS was express advocacy because it "clearly and unequivocally favored certain candidates over other candidates" and "was intended to

---

[6] Defendants state that "disclosure can also discourage corruption by bringing spending to light." Docket No. 17 at 6. However, anti-corruption is recognized as separate from the informational interest. In *Gessler*, 773 F. 3d at 211, the Tenth Circuit rejected the Colorado Secretary of State's assertion of an anti-corruption rationale for reporting independent expenditures, noting that "independent expenditures are not tied to corruption."

advocate against particular candidates." *Id.* at 2.  Because it was express advocacy, the AHO found that the October 2019 issue was an electioneering communication that did not contain the requisite disclaimers and disclosure.  *Id.*  Defendants have subsequently acknowledged that this was in error and that, if a communication is express advocacy, it would be regulated as an expenditure and not as an electioneering communication.  *See* Docket No. 17 at 9.

Plaintiff argues that the test used by the AHO to determine whether TWS is express advocacy is impermissible.  *See* Docket No. 2 at 11-12; Docket No. 18 at 11-12.  Specifically, plaintiff claims that using the intent of the speaker to determine whether a communication is express advocacy is contrary to Supreme Court precedent. Docket No. 2 at 9.  Plaintiff argues that express advocacy means either "communications that in express terms advocate the election or defeat of a clearly identified candidate," *Buckley*, 424 U.S. at 44, n.52,[7] or the "functional equivalent of express advocacy,"[8] as defined in the controlling opinion of the Chief Justice in *Fed. Election Comm'n v. Wis. Right to Life, Inc*., 551 U.S. 449, 469-70 (2007) (hereinafter "*WRTL II*").[9]  *Id.* at 9-10.  In *WRTL II*, 551 U.S. at 469-70, the Chief Justice stated that a communication is the functional equivalent of express advocacy "only if the

---

[7] In a footnote, *Buckley* stated that this would include words "such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject,'" 424 U.S. at 44 n.52, which have come to be known as the "magic words."

[8] Plaintiff states that it preserves for appeal the argument that only *Buckley*'s express advocacy test, and not the functional equivalence test, should apply.  *See* Docket No. 2 at 11 n.3.

[9] The Court refers to this case as *WRTL II* as distinguished from the earlier opinion, *Wis. Right to Life, Inc. v. Fed. Election Comm'n*, 546 U.S. 410 (2006).

[communication] is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.*"*

Defendants largely fail to respond to this portion of plaintiff's argument. Defendants do not put forth an argument regarding the test the Clerk will use to determine whether speech is express advocacy, and therefore an independent expenditure.[10]  *See generally* Docket No. 17.  However, defendants do make an argument regarding the constitutionality of the term "expenditure" in the Colorado Constitution.  *See id.* at 2-3.  Defendants argue that the Colorado Supreme Court has interpreted "expenditure" to mean "only those communications that explicitly advocate for the election or defeat of a candidate in an upcoming election," and cite the *Buckley* definition of express advocacy as used in the definition of expenditure.  *Id.* at 3. Accordingly, there appears to be no disagreement between defendants and plaintiff that *Buckley* and subsequent Supreme Court caselaw provide the proper definition of express advocacy when it is used to define an expenditure.

Therefore, the Court finds that when express advocacy is used in the definition of expenditure in the ordinance, it means express advocacy or its functional equivalent as defined in *Buckley* and *WRTL II*.  The Court finds that the two issues of TWS that have been presented in the course of this litigation–the October 2019 and Spring/Summer 2021 issues–do not meet this definition.  Defendants admitted as much

---

[10] Defendants cite *Harwood v. Senate Majority Fund*, 141 P.3d 962 (Colo. App. 2006), which discusses the definition of electioneering communications.  *See* Docket No. 17 at 8.  Defendants make no argument that the meaning of electioneering communications in *Harwood* equates to the meaning of express advocacy as used in the definition of expenditure in the Lakewood ordinance, and the Court therefore does not consider this argument.

at the TRO hearing with respect to the Spring/Summer 2021 issue when defendant

Roome, through counsel, stated that there was no potential for enforcement as to the

Spring/Summer 2021 TWS issue as it was written.

The October 2019 issue is likely to be a representative example of a fall edition

in an election year.  The issue is eight pages long; the "Inside this Issue" has sixteen

articles titled: "Voters Approve Slower Growth," "November City Elections," "Summary

of 200 Financing," "Campaign Finance Reforms Fail," "Misc. 200 Issues/Impacts,"

"Ways to Get Around the Rules," "Complaint against deGruy," "Council Campaign

Financing," "Council Races - Ward 1, 3 & 5," "Mayoral Race - Track Records," "Jeffco

De-TABOR Issue," "Jeffco Refuses to Collect Loans," "Trash Hauler Regulation Issue,"

"Budget Issues & Pay Raises," "Rooney Valley Lawsuits," and "Union Blvd.

Neighborhood Study."  *See* Docket No. 2-6 at 11.  The first two pages of the October

2019 edition describe the results of a special election and an issue on the November

2019 ballot called Question 200.  *See id.* at 11-12.  The third and fourth pages have

articles on the upcoming city council races, the various fund-raising sources of the

candidates, and comparisons of the candidates in three of the races.  *See id.* at 13-14.

There are additional articles about alleged campaign finance violations of a city council

candidate.  *Id.* at 13.   The fifth page describes the voting records of the five mayoral

candidates as well as the donor sources of two mayoral candidates.  *Id.* at 14.  Page six

has articles on the Taxpayer Bill of Rights ("TABOR"), non-repayment of a loan by

developers owed to Jefferson County, and school board candidates.  *Id.* at 15.  Page

seven is focused on a waste management ballot issue, and page eight has another

TABOR article as well as articles about over-development.  *See id.* at 17-18.

In *Citizens United*, 558 U.S. at 325, the Court found that the feature length film *Hillary: The Movie* was the functional equivalent of express advocacy.  The Court stated that "[t]he movie, in essence, is a feature-length negative advertisement that urges viewers to vote against Senator Clinton for President. . . .  The narrative may contain more suggestions and arguments than facts, but there is little doubt that the thesis of the film is that she is unfit for the Presidency."  *Id.*  In contrast, the October 2019 issue of TWS does not deem any particular candidate fit or unfit for office.  While a few articles disfavor Adam Paul for mayor, *see, e.g.*, Docket No. 2-6 at 16 (describing Mr. Paul's endorsement of a ballot issue as a "classic *you scratch my back and I'll scratch yours*"), as a whole, the articles in the October 2019 issue describe, more than offer opinions, regarding the 2019 Lakewood election candidates and issues, as well as other issues facing the City.  *See, e.g.*, *id.* at 18 (describing fight between developers and the Green Mountain Water District Board and discouraging voters from using ballot harvesters).  Defendants admitted at the PI hearing that the Spring/Summer 2021 TWS issue touched on too many topics to be considered express advocacy under the ordinance.  The October 2019 issue similarly covers many different issues before the City; some articles mention candidates or ballot issues, but some do not.  *Compare* Docket No. 2-6 at 15 (listing mayoral candidates' voting records), *with id.* at 16 (describing failed repayment of a loan by developers to Jefferson County and Lakewood).  In light of the broad spectrum of issues in a TWS newsletter, the Court finds that TWS editions are susceptible to reasonable interpretations as something

other than appeals to vote for or against a specific candidate.  *Cf. WRTL II*, 551 U.S. at 469-70 ("[A] court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.").

Accordingly, the Court finds that the issues of TWS that have been presented to the Court are not express advocacy or its functional equivalent. [11]  *Cf. Citizens United*, 558 U.S. at 325-26 (evaluating film as a whole to determine whether it was the functional equivalent of express advocacy).[12]  Therefore, section 2.54.030(F) of the ordinance cannot be applied to TWS and the Court will enjoin defendants from doing so.[13]

---

[11] Plaintiff also argues that the independent expenditure regulations do not survive exacting scrutiny.  *See* Docket No. 2 at 6, 11-12.  Because the Court finds that the issues of TWS are not express advocacy or its functional equivalent and that the regulations therefore do not apply, the Court need not decide if they survive exacting scrutiny.

[12] At the PI hearing, defendants put forth a limiting principle in the interpretation of what donor disclosures would actually be required.  Defendants argued that, when reviewing a publication like the Spring/Summer 2021 issue of TWS, the Clerk was unable to determine that any donation was made for the purpose of express advocacy because there are simply too many articles and issues being discussed.  However, donor disclosure is not the only requirement of the ordinance.  It also requires, *inter alia*, registration as an independent expenditure committee, a separate bank account for donations, and a disclaimer.  *See* Lakewood, Colo., Municipal Code § 2.54.030(F)(1), (3), (5).  Because the Court finds that the independent expenditure provisions of the ordinance do not apply to TWS, the Court need not address whether this limiting construction would allow the ordinance to survive exacting scrutiny as applied to plaintiff.

[13] The Court assumes that the October 2019 and Spring/Summer 2021 editions are representative TWS editions.

### C.  Electioneering Communications

Plaintiff argues that, because its fall 2021 issue of TWS will be published within 60 days of the Lakewood municipal election and will name candidates for office, it fears it will be fined if it does not comply with the ordinance's requirements for electioneering communications.  Docket No. 2 at 1.  Plaintiff argues that the ordinance's electioneering communications regulations do not survive exacting scrutiny because they are not substantially related and narrowly tailored to the informational interest as applied to plaintiff.  *Id.* at 3.  Plaintiff also argues that the regulations are facially unconstitutional because of vagueness and overbreadth concerns.  *Id.*  Defendants argue that the definition of electioneering communications passes constitutional muster and application of the ordinance to TWS's issues survives exacting scrutiny.  Docket No. 17 at 3-5, 8.

#### 1.  *Regulatory Framework*

> *Electioneering communication* means any communication broadcast by television or radio, printed in a newspaper or on a billboard, directly mailed, transmitted by means of the internet, or delivered by hand to personal residences or otherwise distributed that: (I) unambiguously refers to any candidate without expressly advocating that candidate; and (II) is broadcast, printed, mailed, delivered or distributed within 60 days before a municipal election; and (III) is broadcast to, printed in a newspaper distributed to, mailed to, delivered by hand or electronically transmitted to any communication by persons made in the regular course and scope of their business or any to an audience that includes members of the electorate for such public office.

Municipal Code § 2.54.020.  Any person who expends more than $500 annually on electioneering communications must report the amount expended on the communications and the name and address of any person who contributes more than

$250 annually to the person expending more than $500 on the communications.  *Id.* § 2.54.070(1).  A person who contributes more than $500 for the purpose of making an electioneering communication must also report, within 48 hours of a donation, the names and addresses of the person's chief executive officer, any professional lobbyists that have been paid to communicate with covered official as defined by the Colo. Rev. Stat. § 24-6-301(1.7), and any person paid to communicate with the mayor or city council members concerning changes to Lakewood ordinances, resolutions, or rules. *Id.* § 2.54.070(2).  The communication must include a disclaimer that it was "paid for by (full name of the person paying for the communication)," the communication is "[n]ot authorized by any candidate", and the name of a natural person who is the registered agent if the person paying for the electioneering communication is not a natural person. *Id.* § 2.54.070(3)(a).  Additional regulations specify the size and placement of the disclaimer.  *See id.* § 2.54.070(3)(b)-(d).

The primary differences between an electioneering communication and an independent expenditure is what they apply to and their timing.  An electioneering communication is *not* express advocacy, *see* Municipal Code § 2.54.020 (an electioneering communication "means any communication . . . that: (I) unambiguously refers to any candidate without expressly advocating that candidate."), while an independent expenditure *is* express advocacy.  *See id.* (an expenditure is "any purchase . . . for the purpose of expressly advocating the election or defeat of a candidate.").  Moreover, an electioneering communication is made within 60 days of an election, while an independent expenditure is not temporally limited.  *See id.*

§ 2.54.020.

### 2. *Exacting Scrutiny*

Plaintiff argues that the definition of electioneering communications "pulls in all news reporting before an election, explicitly noting that it covers communications that are *not* express advocacy." Docket No. 2 at 7. Defendants argue that the definition of electioneering communication is not so broad. Docket No. 17 at 7. Defendants argue that the Court should find that, under *Harwood*, 141 P.3d at 966, a case that also construed the meaning of "electioneering communications," the definition of electioneering communication does not include all mentions of a candidate, but rather only those communications meant to sway public opinion. *Id.* at 8.

In *Harwood*, the Colorado Court of Appeals examined the definition of electioneering in Colo. Const. art. XXVIII, which defines "electioneering communication" as

> any communication broadcasted by television or radio, printed in a newspaper or on a billboard, directly mailed or delivered by hand to personal residences or otherwise distributed that:
> (I) Unambiguously refers to any candidate; and
> (II) Is broadcasted, printed, mailed, delivered, or distributed within thirty days before a primary election or sixty days before a general election; and
> (III) Is broadcasted to, printed in a newspaper distributed to, mailed to, delivered by hand to, or otherwise distributed to an audience that includes members of the electorate for such public office.

Colo. Const. art. XXVIII, § 2(7)(a). The court held that "the Colorado electorate intended Article XXVIII to regulate communication that expresses 'electoral advocacy' and tends to 'influence the outcome of Colorado elections.'" *Harwood*, 141 P.3d at 966. The key difference between the provision in *Harwood* and this case, however, is that

the definition of electioneering communication in this case excludes express advocacy. *See* Municipal Code § 2.54.020 ("Electioneering communication means any communication . . . that: (I) Unambiguously refers to any candidate *without expressly advocating that candidate* . . . ." (emphasis added)).  Therefore, defendants' argument that the Court should only consider electioneering communications to be those that tend to influence the outcome of an election, based on *Harwood*, is misplaced.

Plaintiff argues that the Court should either find that the electioneering communication regulations are unconstitutional or, in the alternative, impose a limiting construction that they can only reach express advocacy or its functional equivalent. The Court addresses the limiting construction argument first.

In *Citizens United*, 558 U.S. at 366, the Court considered, among other things, the constitutionality of the electioneering communication disclaimer and disclosure provisions of the Bipartisan Campaign Reform Act of 2002 ("BCRA").  Under BCRA, any person spending more than $10,000 on electioneering communications in a calendar year was required to file a disclosure statement with the Federal Election Commission identifying "the person making the expenditure, the amount of the expenditure, the election to which the communication was directed, and the names of certain contributors."  *Id.*  Citizens United argued that applying the disclosure and disclaimer provisions to *Hillary: The Movie*, and three advertisements for the movie, was unconstitutional.  *Id.*  The Court, applying exacting scrutiny, upheld the disclaimer and disclosure requirements under Congress's informational interest.  *Id.* at 371.  The Court found that the advertisements were electioneering communications because they

21

"referred to then-Senator Clinton by name shortly before a primary and contained pejorative references to her candidacy." *Id.* at 368.  However, the Court rejected Citizens United's argument that the disclosure requirements in BCRA § 201 must be confined to express advocacy or its functional equivalent. *Id.*  The Court noted that "disclosure is a less restrictive alternative to more comprehensive regulations of speech" and "the public has an interest in knowing who is speaking about a candidate shortly before an election." *Id.* at 369.  The Court stated:

> The principal opinion in *WRTL [II]* limited 2 U.S.C. § 441b's restrictions on independent expenditures to express advocacy and its functional equivalent.  551 U.S., at 469-476 (opinion of ROBERTS, C.J.).  Citizens United seeks to import a similar distinction into BCRA's disclosure requirements.  We reject this contention.

*Id.* at 368-69.  Because *Citizens United* did not require BCRA's electioneering communication disclosure and disclaimer requirements to be limited to express advocacy or its functional equivalent in order to survive exacting scrutiny, the Court here declines plaintiff's invitation to interpret the Lakewood ordinance with this limiting principle.  In interpreting *Citizens United*, the Tenth Circuit has held that "[i]t follows from *Citizens United* that disclosure requirements can, if cabined within the bounds of exacting scrutiny, reach beyond express advocacy to at least some forms of issue speech." *Indep. Inst.*, 812 F.3d at 795.  Accordingly, the Court rejects plaintiff's alternative argument that the electioneering communications should only regulate express advocacy or its functional equivalent.  *See* Docket No. 2 at 9-10; Docket No. 18 at 7.

Although the Court finds that the definition of electioneering communication need

not be limited to express advocacy or its functional equivalent, this does not mean that the application of the electioneering communication regulations to TWS passes exacting scrutiny.

To pass exacting scrutiny, the ordinance must be sufficiently related and narrowly tailored to the informational interest. *See APF*, 141 S. Ct. at 2384 ("A substantial relation is necessary but not sufficient to ensure that the government adequately considers the potential for First Amendment harms before requiring that organizations reveal sensitive information about their members and supporters."). "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). Even if Lakewood has an informational interest in the electioneering communication regulations, the Court finds that these regulations are neither sufficiently related nor narrowly tailored to the informational interest.

The Court first discusses the disclaimer provision. This provision requires that an electioneering communication that costs more than $500 include a statement that it was "paid for by (full name of the person paying for the communication)," the communication is "[n]ot authorized by any candidate," and the name of a natural person who is the registered agent if the person paying for the electioneering communication is not a natural person. Municipal Code § 2.54.070(3)(a).

Plaintiff argues that the disclaimer requirement does not serve the informational interest because a reader would not think a candidate had authorized an entire newsletter. Docket No. 2 at 5. Plaintiff additionally argues that, if disclaimers are

23

required for each individual article, this would displace much of plaintiff's reporting.  *Id.* at 6.  Defendants' response argues that the informational interest applies to plaintiff, but does not specifically address the disclaimer provision.  *See* Docket No. 17 at 6-7.  At the PI hearing, defendants stated that they believed the disclaimer requirement would be met by a single disclaimer for the entire newsletter on the first or last page, and not individual disclaimers for each article.  Defendants then argued that the disclaimer provision, read this way, served the informational interest because it informed a reader that the TWS issue was not authorized by any candidate, was paid for by plaintiff, and gave the information for the registered agent, which would allow a reader to contact plaintiff and look into plaintiff's financial disclosures.

The ordinance states that disclaimers are required for "any electioneering communication on which the person responsible for the communication expends $500.00 or more."  Municipal Code § 2.54.070(3)(a).  The ordinance requires that for a nonbroadcast communication, "the City Clerk shall, by rule, establish size and placement requirements for the disclaimer."  *Id.* § 2.54.070(3)(c).  Because the Clerk is the party tasked with establishing the placement requirements for the disclaimer and has represented that an issue of TWS would only require one disclaimer, the Court finds that the ordinance only requires one disclaimer per issue of TWS.  *Cf. Gessler*, 773 F.3d at 206 (discussing Colorado Secretary of State's interpretation of two exemptions to the definition of electioneering communication in Colorado Constitution).

As applied to TWS, defendants do not explain what interests the regulations serve.  TWS already states that it is published by Watchdog.  *See* Docket No. 2-6 at 11. While articles do not list an author, TWS provides contact information and lists the

24

names of three persons under "Watchdog Volunteer Staff," including its president, editor, and researcher. *See id.* at 18. The only new information the disclaimer would provide to a reader is that the newsletter is not authorized by any candidate. Defendants argue that, without disclosure, "there is simply no way for anyone who receives the Watchdog to have any idea about who's views are being presented, make any assessment of the motivations for said views, and make any assessment about what effects those views and that support may have on elected officials." Docket No. 17 at 7. Plaintiff argues that no one would expect a candidate to authorize an entire newsletter, especially because articles frequently are unrelated to candidates. Docket No. 2 at 5. The October 2019 issue of TWS contains articles ranging from the voting records of mayoral candidates to the use of TABOR refunds. *See* Docket No. 2-6 at 15, 18; *see also supra* Section II.B.3 (describing contents of October 2019 TWS issue). Plaintiff's antagonism toward perceived over-development in Lakewood and Jefferson County gets particular attention, including articles about the results of a special election to limit housing growth and a developer's refusal to repay a loan. Docket No. 2-6 at 1, 16.

Because the issues of TWS state that they are published quarterly by plaintiff, identify plaintiff's staff, and contain articles on many different issues that frequently do not mention a candidate, *see* Docket Nos. 2-6, 2-11, the Court finds that the disclaimer provision is not substantially related and narrowly tailored to the informational interest as applied to plaintiff.

The Court next considers the disclosure provision and comes to the same conclusion. This provision requires Watchdog to report the name and address of any

person who contributes more than $250 to Watchdog annually if Watchdog expends over $500 annually on an electioneering communication.  Municipal Code § 2.54.070(1).  If the contributor is a natural person, the disclosure must also include the person's occupation and employer.  *Id.*  The ordinance states that an electioneering communication is any communication distributed within 60 days of a municipal election to the relevant electorate that "unambiguously refers to any candidate without expressly advocating that candidate."[14]  *Id.* § 2.54.020.  The Court has already rejected defendants' argument that electioneering communications are only those intended to influence an election and rejected plaintiff's alternative argument that electioneering communications can only regulate express advocacy or its functional equivalent.

The informational interest is served by knowing "who is speaking about a candidate shortly before an election."  *Citizens United*, 558 U.S. at 369.  However, it is not clear that a donor to Watchdog is a person talking about a candidate.  In *Independence Institute*, 812 F.3d 789-90, the Tenth Circuit upheld the application of a Colorado electioneering communication regulation to an advertisement urging voters to support an audit of Colorado's Health Benefit Exchange that mentioned Colorado's incumbent governor by name and instructed viewers to call the governor to tell him to

---

[14] The ordinance states that "*[e]lectioneering communication* means any communication . . . that: . . .  (III) is broadcast to, printed in a newspaper distributed to, mailed to, delivered by hand or electronically transmitted to any communication by persons made in the regular course and scope of their business or any to an audience that includes members of the electorate for such public office."  Municipal Code § 2.54.020.  The Court is unsure what a communication that is "delivered by hand or electronically transmitted to any communication by persons made in the regular course and scope of their business" means, but finds that this lack of clarity is immaterial to the grounds on which the Court rests its finding that the ordinance does not satisfy exacting scrutiny.

support audit legislation.  The court found *Citizens United* dispositive of the issue, but noted that "it is important to remember that the Institute need only disclose those donors who have specifically earmarked their contributions for electioneering purposes." *Id.* at 797-98.  There is no electioneering communication earmark requirement in the Lakewood ordinance; it requires Watchdog to disclose "the name and address of any person that contributes more than $250 per year to the person expending $500.00 or more on the communications."  *See* Municipal Code § 2.54.070(1).  Additionally, Watchdog typically publishes two to three issues of TWS per year, *see* Docket No. 2-1 at 2, ¶ 4; the funds of a person who donates to Watchdog in January of a year that holds a November election may be spent on one of the earlier issues of TWS that would not be published within 60 days of an election.  However, the regulations would still require Watchdog to report this person's information.

The Court agrees with plaintiff that applying the electioneering communication regulations to Watchdog's donors would imply that a donor supported or opposed a particular candidate, when a donor may simply value TWS's discussion of local issues, such as the potential expansion of the water storage capacity of Bear Creek Lake. *See, e.g.*, Docket No. 2-11 at 8 (discussing reservoir capacity).  Donor A may wish to support TWS's coverage of local elections.  Donor B may donate in order to support TWS's discussion of local, non-election issues.  There is no earmarking requirement in the ordinance, so there is no indication that plaintiff knows the intentions of Donor A and Donor B.  But the ordinance requires plaintiff to disclose their information equally so long as they both donate over $250 annually.  This creates a "mismatch" between the interest served–knowing who is speaking about a candidate–and the information

27

given.  *Cf. APF*, 141 S. Ct. at 2386 ("There is a dramatic mismatch, however, between the interest that the Attorney General seeks to promote and the disclosure regime that he has implemented in service of that end.").

A municipality is "not free to enforce *any* disclosure regime that furthers its interests.  It must instead demonstrate its need for universal production in light of any less intrusive alternatives." *Id.*  Defendants' primary argument is that electioneering communications are only those that are intended to influence an election.  *See* Docket No. 17 at 8.  However, the Court has rejected that argument.  A less intrusive alternative could be only requiring the disclosure of those who earmarked their donations for electioneering communications, as was the case in *Independence Institute*, 812 F.3d at 797.  Because an issue of TWS published within 60 days of a municipal election will be an electioneering communication, the Court finds that defendants have failed to demonstrate the need for the disclosure of all of plaintiff's donors over $250 for an election year.  Accordingly, the Court finds that the electioneering communication disclosure provisions do not pass exacting scrutiny as applied to plaintiff.[15]

---

[15] Defendants argue that plaintiff is merely seeking a press exemption, but *Citizens United* foreclosed any special First Amendment privileges for the press. Docket No. 17 at 5.  Plaintiff argues that the ordinance is unconstitutional as applied to news reporting, not that its status as a media source conveys additional protection. Docket No. 18 at 3.  The Court does not rely on the lack of a press exemption to find the electioneering communications unconstitutional as applied to Watchdog.  While a regulation may "properly distinguish the news media from other speakers" in certain circumstances, "that distinction has no basis in the First Amendment and cannot immunize differential treatment from a First Amendment challenge; a difference in treatment would have to be defended on other grounds." *Gessler*, 773 F.3d at 212.  In this case, the Court finds that the electioneering communication regulations do not survive exacting scrutiny because the regulations are not substantially related and

Therefore, the Court finds that the application of the section 2.54.070 of the Lakewood Municipal Code to Watchdog violates the First Amendment.  Because this finding affords plaintiff relief from the regulations, the Court declines to address plaintiff's challenge that the ordinance is facially unconstitutional due to overbreadth and vagueness.  *See* Docket No. 2 at 3; *see also Gessler*, 773 F.3d at 203 ("We do not address the facial challenge to the disclosure provisions, because we afford Citizens United the relief it requested through its as-applied challenge.").

## III.  CONCLUSION

For the foregoing reasons, the Court finds that the independent expenditure regulations, section 2.54.030(F), cannot be applied to issues of TWS because TWS is neither express advocacy nor its functional equivalent.  Additionally, the Court finds that the electioneering communication regulations, section 2.54.070, as applied to Watchdog, violate the First Amendment because they are neither substantially related nor narrowly tailored to the informational interest.

The parties have agreed that, pursuant to Fed. R. Civ. P. 65(a)(2), the preliminary injunction hearing was advanced to a trial on the merits and the briefing and argument at the hearing was the full extent of the required argument in this case.  Accordingly, it is

**ORDERED** that defendants are enjoined from applying Lakewood, Colo., Municipal Code § 2.54.030(F) to issues of *The Whole Story*.  It is further

**ORDERED** that Lakewood, Colo., Municipal Code § 2.54.070 violates the First

---

narrowly tailored to the informational interest as applied to plaintiff.

Amendment as applied to plaintiff.  It is further

**ORDERED** that this case is closed.

DATED September 7, 2021.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge